**NATIONAL ORGANIZATION FOR WOMEN, et al., Plaintiffs,**

**v.**

**OPERATION RESCUE, et al., Defendants.**

**Civ. A. No. 89–1558–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 6, 1989.

Pamela S. Passman, John H. Schafer, Covington & Burling, Alison Wetherfield, NOW Legal Defense & Educ. Fund, Washington, D.C., for plaintiffs.

Douglas Davis, Christian Advocates Serving Evangelism, Washington, D.C., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELLIS, District Judge.

This matter comes before the Court on Plaintiffs' Application for a Permanent Injunction to enjoin defendants, *inter alia,* from trespassing on, sitting in, blocking, impeding or obstructing ingress into or egress from, any facility in the Washington Metropolitan area that offers and provides legal abortion services and related medical and psychological counselling.

The Court sets forth here its findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

#### Proceedings to Date

1. This cause first came before the Court on November 8, 1989 on plaintiffs' motion for a Temporary Restraining Order ("TRO") enjoining defendants from, *inter alia,* physically impeding access to, and egress from, premises that offer and provide legal abortion services and related medical and psychological counselling. Plaintiffs moved for an expedited hearing on this matter. The Court heard oral argument on the TRO on November 8 and 9, 1989. Plaintiffs appeared by counsel. Defendants, having received actual notice of the proceeding, as well as copies of plaintiffs' pleadings, also appeared by counsel. Defendants' counsel accepted service of plaintiffs' complaint and related papers. At the conclusion of the hearing, the Court, having made the requisite findings, issued the TRO.

2. Following the entry of the TRO, the Court, with the parties' consent, and pursuant to Rule 65(a)(2), Fed.R.Civ.P., ordered the trial of the action on the merits to be advanced and consolidated with the hearing on the application for a preliminary injunc-tion. The consolidated and expedited merits trial was set for November 16, 1989.

3. As scheduled, the merits trial of this action commenced on November 16, 1989, lasted two (2) days and ended on November 20, 1989.[1] Plaintiffs presented oral testimony from nine (9) witnesses and introduced documentary evidence. Plaintiffs' witnesses were:

— Nancy Dickinson–Collins, registered nurse and Director of the Commonwealth Women's Clinic, Falls Church, Virginia;

— Dr. Eugene W. Williams, Jr., obstetrician/gynecologist and Medical Director of Planned Parenthood of Metropolitan Washington ("PPMW"), Washington, D.C.;

— Patricia Ireland, Vice President of the National Organization of Women ("NOW") and Director of NOW's Project Stand Up for Women.

— Lieutenant Gregory D. King, Police Officer, City of Falls Church and Commander of Uniform Patrol, Falls Church, Virginia;

— Kirsten Johnson, General Project Staff, NOW, Washington, D.C.;

— John Alan Bates, Jr., Volunteer, NOW, Washington, D.C. and Employee, Buyers Up/Public Citizen Consumer Group, Washington, D.C.;

— Barbara Lofton, Ph.D., Clinical Administrator for Hillview Women's Surgical Center, Forestville, Maryland;

— Jessica Sutin, Administrative Manager, PPMW, Washington, D.C.; and

— Allen Turnbull, retired citizen and resident of Bowie, Maryland.

Admitted as record evidence in this case were Plaintiffs' Exhibits # 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, and 18.

4. Defendants elected to present no evidence.

5. At the conclusion of the trial, the Court stated its findings and conclusions

---

**1.** The 10–day Temporary Restraining Order was originally scheduled to expire at 4:00 pm on Saturday, November 18, 1989. Because the trial on the merits would not be completed prior to this time, the Court, for good cause shown and pursuant to Rule 65(b), Fed.R.Civ.P., extended the TRO for an additional 10 days. The permanent injunction, superseding the TRO, was entered on November 22, 1989.

from the bench and granted the request for a permanent injunction. These written findings of fact and conclusions of law supplement those issued from the bench.

### Parties

6. Plaintiffs are nine (9) clinics ("clinic plaintiffs") that, *inter alia*, provide abortions or abortion counselling and five (5) organizations ("organizational plaintiffs") that, *inter alia*, seek to establish and preserve women's right to obtain abortions.

7. Organizational plaintiffs, National Organization for Women, 51st State National Organization for Women, Maryland National Organization for Women, Virginia National Organization for Women and Planned Parenthood of Metropolitan Washington, D.C., Inc. are membership organizations. They sue on behalf of themselves and their members, who include women who may wish to use abortion and family planning clinics in the Eastern District of Virginia and elsewhere.

8. The Court dismissed the National Abortion Federation as a plaintiff in this action. Counsel for plaintiffs offered no evidence identifying this entity or establishing any cause of action it might have.

9. Clinic plaintiffs provide abortions services and related medical and psychological counselling to residents of the Washington Metropolitan area [2] and elsewhere. They are:

#### District of Columbia Clinics

— Capitol Women's Clinic, Inc., 1339 22nd Street, N.W.

— Hillcrest Women's Surgi–Center, 7603 Georgia Avenue, N.W.

#### Maryland Clinics

— Metropolitan Family Planning Institute, 5915 Greenbelt Road, College Park

#### Virginia Clinics

— Alexandria Women's Health Center, 101 South Whiting Street, Alexandria

— Commonwealth Women's Clinic, 916 West Broad Street, Falls Church

— Gynecare Associates, 312 South Washington Street, Alexandria

— Metro Medical Center, Inc., d/b/a Annandale Women's Center, 2871 Duke Street, Alexandria

— NOVA Women's Medical Center, 9900 Main Street, Suite 305, Fairfax

— Planned Parenthood of Metropolitan Washington, D.C., Inc., 5622 Columbia Pike, Suite 303, Falls Church

— Planned Parenthood of Metropolitan Washington, D.C., Inc., 10875 Main Street, Suite 208, Fairfax

— Prince William Women's Clinic, 9384–C Forestwood Lane, Manassas

10. Defendants include one (1) organization and six (6) individuals opposed to abortion and its legalization.

11. Defendant Operation Rescue is an unincorporated association whose members oppose abortion and its legalization. Its principal goals are to stop abortion and to end its legalization. Among the activities it pursues to achieve these goals are demonstrations it terms "rescues." In general, a "rescue" is a demonstration at the site of a clinic where abortions are performed. At a "rescue," the demonstrators, called "rescuers," intentionally trespass on the clinic's premises for the purpose of blockading the clinic's entrances and exits, thereby effectively closing the clinic. In so doing, "rescuers" view their blockading efforts as "rescues" of fetuses scheduled for abortion.

12. Project Rescue, The D.C. Project and The Veterans Campaign for Life were named as defendants in the amended complaint. But as reflected in the evidence, and confirmed by plaintiffs' counsel, none is a legal entity capable of being sued; rather they are names of events organized and coordinated by Operation Rescue for the purpose of conducting "rescues" at

---

**2.** The Washington Metropolitan area encompasses the District of Columbia, Prince Georges County and Montgomery County in Maryland and Arlington County, Fairfax County, City of Fairfax, City of Falls Church, Loudoun County, Prince William County, and the City of Alexandria in Virginia. The Virginia localities are collectively referred to throughout as "Northern Virginia."

abortion facilities in the Washington Metropolitan area. Because Project Rescue, The D.C. Project and The Veterans Campaign for Life are not legal entities, they are deleted as defendants.

13. The individual defendants are persons who are opposed to abortion and its legalization and who are deeply committed to taking active steps to advance their views, including planning, organizing and participating in "rescue" demonstrations under the banner and auspices of Operation Rescue. The individual defendants are:

— Randall Terry, National Director and Founder of Operation Rescue. Terry is currently incarcerated in the Fulton County Correctional Facility, Fulton County, Georgia. The record reflects that Terry has played, and continues to play, a leading role in organizing and coordinating "rescues" and disruptions of abortion and family planning facilities in the Washington Metropolitan area.

— Patrick Mahoney, retained Consultant to Operation Rescue. Mahoney organizes and coordinates "rescues" and related activities in the Washington Metropolitan area for Operation Rescue. Mahoney was present at, and participated in, "rescues" organized and performed by Operation Rescue on November 17 and 18, 1989 in the Washington Metropolitan area.

— Clifford Gannett, Director of Project Rescue. Gannett organizes and coordinates "rescues" and related activities in the Washington Metropolitan area.

— Michael McMonagle organizes and coordinates "rescues" and related activities for Operation Rescue in the Washington Metropolitan area.

— Michael Bray and Jayne Bray organize and coordinate "rescues" and related activities for Operation Rescue in the Washington Metropolitan area. Jayne Bray was arrested by Lieutenant Gregory D. King of the Falls Church, Virginia Police Department for her activities at a "rescue" demonstration at the Commonwealth Women's Clinic in Falls Church, Virginia on October 29, 1988.

*Facts*

14. It is indisputable that all defendants share a deep commitment to the goals of stopping the practice of abortion and reversing its legalization. To achieve these goals, it appears from the record that the individual defendants have agreed and combined with one another and with defendant Operation Rescue to organize, coordinate and participate in "rescue" demonstrations at abortion clinics in various parts of the country, including the Washington Metropolitan area. The purpose of these "rescue" demonstrations is to disrupt operations at the target clinic and indeed ultimately to cause the clinic to cease operations entirely. No one has put this point any better than defendant Terry, who in an affidavit, states that "while the child-killing facility is blockaded, no one is permitted to enter past the rescuers ... Doctors, nurses, patients, staff, abortion-bound women, families of abortion-bound women—all are prevented from entering the abortuary while the rescue is in progress." Operation Rescue's literature defines "rescues" as *"physically* blockading abortion mills with [human] bodies, to intervene between abortionists and the innocent victims." *Operation Rescue, National Day of Rescue—October 29, 1988* (1988) (emphasis in original). By disrupting and blockading family planning and abortion clinics, defendants and their followers hope (i) to prevent abortions, (ii) to dissuade women from seeking a clinic's abortion services and (iii) to impress upon members of society the moral righteousness and intensity of their anti-abortion views.

15. The individual defendants, acting through and in concert with Operation Rescue, have organized "rescue" events under the names D.C. Project, Project Rescue and Veterans' Campaign for Life. These "rescue" events focused on abortion clinics in the Washington Metropolitan area and the record is replete with references confirming the individual defendants' involvement in these events. For example, defendant Gannett is the Executive Director of Project Rescue and defendants Mahoney, McMonagle and Michael Bray have assisted

Operation Rescue in the organization and coordination of the District of Columbia Project and Project Rescue. Defendant Terry agreed to address an October 6, 1989 Project Rescue rally organized by defendant Gannett.

16. Because "rescuers" trespass on to clinic property and physically block ingress into and egress from the clinic, existing and prospective patients, as well as physicians and medical staff are unable to enter the clinic to render or receive medical or counselling services. This creates a substantial risk that existing or prospective patients may suffer physical or mental harm. Trial witnesses, in uncontradicted testimony, convincingly illustrated this point. For example, for some women who elect to undergo an abortion, clinic medical personnel prescribe and insert a pre-abortion laminaria to achieve cervical dilation. In these instances, timely removal of the laminaria is necessary to avoid infection, bleeding and other potentially serious complications. If a "rescue" demonstration closes a clinic, patients requiring the laminaria removal procedure or other vital medical services must either postpone the required treatment and assume the attendant risks or seek the services elsewhere. Uncontradicted trial testimony established that there were numerous economic and psychological barriers to obtaining these services elsewhere.[3] Hence, a "rescue" demonstration creates a substantial risk that a clinic's patients may suffer physical and mental harm.

17. Uncontradicted trial testimony by Dickinson–Collins, a trained mental health professional, established that blockading clinics and preventing patient access could cause stress, anxiety and mental.harm (i) to women with abortions scheduled for that time, (ii) to women with abortion procedures (i.e., laminaria insertion) already underway and (iii) to women seeking counselling concerning the abortion decision.

18. Substantial numbers of women seeking the services of clinics in the Washington Metropolitan area travel interstate to reach the clinics. For example, approximately twenty (20) to thirty (30) percent of patients served at the Commonwealth Women's Clinic in Falls Church, Virginia come from out of state. Records for these patients reflect permanent residence addresses in Maryland, the District of Columbia, Pennsylvania, Texas, West Virginia, New Jersey, New York, and Florida. And at the Hillview Women's Center in Forestville, Maryland, a majority of the patients travel from out of state to obtain abortion services at the clinic. "Rescue" demonstrations, by blocking access to clinics, therefore have the effect of obstructing and interfering with the interstate travel of these women.

19. Defendants' use of "rescue" demonstrations as an anti-abortion protest is not a recent phenomenon. For example, on almost a weekly basis for the last five (5) years, Commonwealth Women's Clinic has been the target of "rescue" demonstrations by Operation Rescue. One of the largest of these occurred on October 29, 1988. That "rescue" succeeded in closing the Clinic from 7:00 a.m. to 1:30 p.m., notwithstanding the efforts of the Falls Church Police Department.[4] "Rescuers" did more than trespass on to the clinic's property and physically block all entrances and exists. They also defaced clinic signs, damaged fences and blocked ingress into and egress from the Clinic's parking lot by parking a car in the center of the parking

---

3. Indigent or impecunious patients at some clinics receive abortion services for a nominal fee or free. Hospitals and other health care facilities often require insurance or full reimbursement for any services rendered. This makes it difficult, if not impossible, for indigent patients to obtain necessary services from other facilities when a "rescue" demonstration closes a clinic.

4. Trial testimony disclosed that the Falls Church Police Department consists of thirty (30) deputized officers. Typical of most "rescue" demon-

strations, the rescuers outnumbered the Falls Church police officers on the scene that day. Even though 240 rescuers were arrested, the police were unable to prevent the closing of the clinic for more than six (6) hours. Limited police department resources combined with the typical absence of any advance notice identifying a target clinic renders it difficult for local police to prevent rescuers from closing a facility for some period of time.

lot entrance and deflating its tires. On this and other occasions, "rescuers" have strewn nails on the parking lots and public streets abutting the clinics to prevent the passage of any cars. Less than a year later, in April 1989, a similar "rescue" demonstration closed the Metropolitan Family Planning Institute in the District of Columbia for approximately four (4) hours.

20. More recently, defendants organized and planned a series of meetings, rallies and "rescues" in the Washington Metropolitan area for the weekends of November 10—12 and 18—20, 1989. These events were the impetus for plaintiffs' filing of this action. Although no Virginia clinics were "rescue" targets, several clinics elsewhere in the Washington Metropolitan area were subjected to "rescue" demonstrations. Clinics in Maryland and the District of Columbia were closed as a result of "rescues" on November 10, 11 and 12, 1989. The following weekend, on November 18, 1989, the Hillcrest Women's Surgi–Center in the District of Columbia was closed for eleven (11) hours as a result of a "rescue" demonstration. Five (5) women who had earlier commenced the abortion process at the clinic by having laminaria inserted were prevented by "rescuers" from entering the clinic to undergo timely laminaria removal.

21. Defendants use of "rescue" demonstrations as an anti-abortion protest is also widespread geographically. "Rescues" have taken place in many places across the country and have been enjoined in New York,[5] Pennsylvania,[6] Washington,[7] Connecticut,[8] and California,[9] as well as the Washington Metropolitan area. Recent "rescue" demonstrations in the District of Columbia and Maryland were carried out in violation of federal injunctions.[10]

22. Defendants show no signs of abandoning "rescue" demonstrations as a means of expressing their intense and deeply felt objection to abortion and its legalization. Counsel for defendants advised the Court that they know of no current plans for "rescue" demonstrations at clinics in the Northern Virginia Area. At the same time, however, defendants' counsel declined to offer the Court any assurance that such "rescue" demonstrations would not be planned and carried out in the future. Moreover, defendants' counsel also declined to report to the Court on behalf of the defendants that Operation Rescue would undertake to direct its membership to refrain from conducting "rescue" demonstrations at Northern Virginia clinics.

23. Defendants well established history of raising and carrying out "rescue" demonstrations in the Washington Metropolitan area and elsewhere, together with their refusal to report to the Court that "rescue" demonstrations designed to close clinics would not be carried out against Northern Virginia clinics in the future, compelled this Court to conclude that there is a substantial likelihood defendants will seek to carry out "rescue" demonstrations in Northern Virginia in the immediate future. The Court also concludes that unless the threatened and unlawful acts to those clinics are immediately and permanently enjoined substantial and irreparable harm will be suffered by the plaintiffs and their members and patients who seek the services of the clinics.

*Conclusions of Law*

*Jurisdiction & Venue*

24. Plaintiffs allege violations of 42 U.S.C. § 1985(3). Therefore, this Court

**5.** *Cousins v. Terry,* 721 F.Supp. 426 (N.D.NY. 1989); *New York State Nat'l Org. for Women v. Operation Rescue,* 704 F.Supp. 1247 (S.D.N.Y. 1989).

**6.** *Roe v. Operation Rescue,* 710 F.Supp. 577 (E.D.Pa.1989); *Northeast Women's Center v. McMonagle,* 665 F.Supp. 1147 (E.D.Pa.1987).

**7.** *Aradia Women's Health Center v. Operation Rescue,* No. 88–1539 R (W.D.Wash. July 7, 1989).

**8.** *Town of West Hartford v. Operation Rescue,* 726 F.Supp. 371 (D.Ct.1989).

**9.** *National Abortion Fed'n v. Operation Rescue,* No. CV 89–1181 (C.D.Cal. March 15, 1989).

**10.** *National Org. for Women v. Operation Rescue,* 726 F.Supp. 300 (D.D.C.1989); *National Org. for Women v. Operation Rescue,* No. 89–3038 (D.Md. Nov. 9, 1989).

has jurisdiction of these claims pursuant to 28 U.S.C. §§ 1331, 1343. Plaintiffs also allege state causes of action. The Court has jurisdiction over these claims pursuant to the doctrine of pendent jurisdiction. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

25. Venue in the Eastern District of Virginia is proper under 28 U.S.C. § 1391(b).

*Mootness*

■ 26. Defendants' plans for meetings, rallies and "rescue" demonstrations for November 10 through 12 and 18 through 20, 1989 were the impetus for this action. Those dates are now past and during those periods no clinic in Northern Virginia was the target of "rescue" demonstrations. These facts, defendants suggest, render this case moot. This suggestion is unpersuasive. The record reflects that defendants have organized, coordinated and participated in "rescue" demonstrations for several years in many parts of the country, including Northern Virginia. This history coupled with the defendants' intense commitment to their anti-abortion goals points convincingly to the substantial likelihood that future "rescue" demonstrations will occur in the Washington Metropolitan area and elsewhere. Given this, the issues raised in this case are "capable of repetition, yet evading review" and, therefore, this case is not moot. *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *see also, Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969) ("a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome"); *Telco Communications, Inc. v. Carbaugh,* 885 F.2d 1225 (4th Cir.1989) (same); *Virginia v. Califano,* 631 F.2d 324, 326 (4th Cir. 1980) (same).

*Standing*

■ 27. Clinic plaintiffs have standing to seek injunctive relief on behalf of themselves, their employees, and their patients. *See Singleton v. Wulff,* 428 U.S. 106, 118, 96 S.Ct. 2868, 2876, 49 L.Ed.2d 826 (1976) (relationship of physician to patient is sufficiently close to allow physician to assert privacy rights of patient); *Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati,* 822 F.2d 1390, 1396 (6th Cir. 1987) (clinics that provide abortion services have standing to assert the rights of their patients, as these rights are " 'inextricably bound up' with the activity the ... clinic desires to pursue.").

■ 28. Organizational plaintiffs have standing to seek injunctive relief on behalf of their members. *New York State Club Ass'n v. City of New York,* 487 U.S. 1, 6, 108 S.Ct. 2225, ——, 101 L.Ed.2d 1 (1988) (association has standing to sue on behalf of its members when those members would have standing to bring the same suit); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (association has standing to bring suit on behalf of its members when (i) members would otherwise have standing to sue in their own right, (ii) the interests it seeks to protect are germane to their organization's purpose and (iii) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit); *Village of Arlington Heights v. Metro Housing Dev. Corp.,* 429 U.S. 252, 260–61, 97 S.Ct. 555, 560–61, 50 L.Ed.2d 450 (1977) (if plaintiff has "alleged such a personal stake in the outcome of the controversy as to warrant invocation of federal court jurisdiction" plaintiff has standing) (citations omitted). Thus, NOW has standing to sue on behalf of its members, who include women who may wish to use abortion facilities in the Washington Metropolitan area.

■ 29. Standing requires that a plaintiff allege personal injury fairly traceable to defendants' allegedly unlawful conduct and likely to be redressed by the requested relief. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Plaintiffs have met these requirements. The record amply demonstrates that unless defendants' threatened and unlawful "rescue" efforts are immediately and perma-

nently enjoined, plaintiffs, their members and patients, may suffer irreparable harm.

*Causes of Action*

30. Plaintiffs assert five causes of action. Two causes of action are federal claims pursuant to 42 U.S.C. § 1985(3). The remaining causes of action are pendent state statutory and common law claims of (i) trespass, (ii) public nuisance and (iii) tortious interference with business.

A. *Conspiracy to Interfere with Plaintiffs' Right to Interstate Travel Pursuant to 42 U.S.C. § 1985(3)*

31. A cause of action under 42 U.S.C. § 1985(3) has four essential elements:

(i) a conspiracy;

(ii) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

(iii) an act in furtherance of the conspiracy;

(iv) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Griffin v. Breckenridge,* 403 U.S. 88, 102–3, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971) (as explained in *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983).

32. "A conspiracy is a combination of two or more persons, by concerted action to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means." 3 E. Devitt & C. Blackmar, Federal Jury Practice & Instructions § 103.23 (1987); *see also* Model Penal Code § 5.03 (Proposed Official Draft 1962). Ample record evidence reflects the existence of a conspiracy among defendants. Specifically, it reflects that the individual defendants combined with each other and with defendant Operation Rescue to plan, organize, coordinate and carry out "rescue" demonstrations that involved unlawful means, including violation of trespass and nuisance laws and Section 1985(3).

33. The Fourth Circuit has characterized the statute's "purpose" element as requiring that the conspiracy be "motivated by a specific class-based, invidiously discriminatory animus." *Buschi v. Kirven,* 775 F.2d 1240, 1257 (4th Cir.1985); *See also, Bloch v. Mountain Mission School,* 846 F.2d 69 (4th Cir.1988) (unpublished opinion).

34. Contrary to defendants' argument, gender-based animus satisfies the "purpose" element of Section 1985(3). To meet the requirement of "class-based discriminatory animus," the class must possess "discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin and *sex.*" *Buschi,* 775 F.2d at 1257 (emphasis added) (denying § 1985(3) protection to a class designated as "whistleblowers") (quoting *Bellamy v. Mason's Stores, Inc.,* 368 F.Supp. 1025, 1028 (W.D.Va.1973), *aff'd,* 508 F.2d 504 (4th Cir.1974). Plaintiffs' members and patients constitute a subset of a gender-based class meeting these requirements. There is, to be sure, a lack of uniformity among courts on this issue. *See eg., Roe v. Abortion Abolition Soc'y,* 811 F.2d 931 (5th Cir.) (holding that patients, doctors, and abortion clinics and their staffs do not form a protected class under § 1985(3)), *cert. denied* 484 U.S. 848, 108 S.Ct. 145, 98 L.Ed.2d 101 (1987); *National Abortion Fed. v. Operation Rescue,* 721 F.Supp. 1168 (C.D.Ca.1989) (same). But, the majority of courts have concluded that a gender-based animus satisfies the conspiracy requirement of § 1985(3). *See Volk v. Coler,* 845 F.2d 1422, 1434 (7th Cir.1988) ("§ 1985(3) extends ... to conspiracies to discriminate against persons based on sex."); *Portland Feminist Women's Health Center v. Advocates for Life, Inc.,* 712 F.Supp. 165, 169 (D.Or.1988) (§ 1985(3) covers women seeking abortions); *Roe v. Operation Rescue,* 710 F.Supp. 577, 581 (E.D.Pa.1989) (same); *New York State Nat'l Organization for Women v. Terry,* 704 F.Supp. 1247 (S.D.N.Y.1989) (same); *Hunt v. Weatherbee,* 626 F.Supp. 1097 (D.Mass.1986) (sex discrimination covered by § 1985(3)); *Skadegaard v.*

*Farrell*, 578 F.Supp. 1209 (D.N.J.1984) (same); *see generally* Annot. *Applicability of 42 U.S.C.S. § 1985(3) to Sex–Based Discrimination*, 46 A.L.R.Fed. 342 (1980). Thus, this Court concludes that a conspiracy to deprive women seeking abortions of their rights guaranteed by law is actionable under Section 1985(3).

35. Defendants engaged in this conspiracy for the purpose, either directly or indirectly, of depriving women seeking abortions and related medical and counselling services, of the right to travel. The right to travel includes the right to unobstructed interstate travel to obtain an abortion and other medical services. *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (in-state residence requirement as prerequisite to abortion services violates right to travel). Testimony at trial establishes that clinics in Northern Virginia provide medical services to plaintiffs' members and patients who travel from out of state. Defendants' activities interfere with these person's right to unimpeded interstate travel by blocking their access to abortion clinics. And, the Court is not persuaded that clinic closings affect only intra-state travel, from the street to the doors of the clinics. Were the Court to hold otherwise, interference with the right to travel could occur only at state borders. This conspiracy, therefore, effectively deprives organizational plaintiffs' non-Virginia members of their right to interstate travel.

36. Since the right to interstate travel is protected from purely private as well as governmental interference, plaintiffs need not show state action to make out a claim under Section 1985(3). *Griffin v. Breckenridge*, 403 U.S. 88, 105–106, 91 S.Ct. 1790, 1801–02, 29 L.Ed.2d 338 (1971);

*New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1360 (2d Cir.1989).

37. The record demonstrates that the overt act requirement of the Section 1985(3) conspiracy is met here. Defendants' history of obstructionist activity, continued "rescue" training sessions, and recent violations of temporary restraining orders preventing "rescue" behavior plainly satisfy the statute's overt act requirement. *See New York State Nat'l Org. for Women*, 704 F.Supp. at 1260 (facts evidencing demonstrations aimed at preventing women from obtaining abortions satisfy the overt act requirement).

38. While the clinics are closed, patients are unable to receive medical treatment. Medical emergencies could arise in connection with abortions that would require immediate medical attention. Thus, clinic closings pose a serious threat of harm to women who are undergoing, or have undergone, abortions. Thus, defendants' continued threat to plaintiffs' exercise of their federally guaranteed right to travel satisfies the Section 1985(3) injury element. *New York State Nat'l Org. for Women*, 704 F.Supp. at 1260. Defendants' conduct clearly evidences an intent to continue this conduct.

39. Plaintiffs have, therefore, clearly established all of the elements of a violation of Section 1985(3) and as such, are entitled to relief.

B. *Conspiracy to Interfere with Plaintiffs' Privacy Rights Pursuant to 42 U.S.C. § 1985(3)*

40. Plaintiffs' also seek relief on the ground that defendants' rescue demonstrations violate Section 1985(3) because they infringe on the fundamental right of plaintiffs' members and patients to obtain an abortion. Recognizing the likely absence of state action on these facts,[11] plain-

---

11. Where the claimed abortion right is a penumbral privacy right emanating from the First Amendment, state action must be shown to support a claim under Section 1985(3). *See New York State Nat'l Org. for Women*, 886 F.2d 1339, 1358 (2d Cir.1989) ("[w]hen the asserted constitutional deprivation is based upon a right guaranteed against government interference ... plaintiffs must demonstrate some state action.");

*see also United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983) (same). There is some authority, however, that the state action requirement is satisfied when "rescuers" refuse to notify the police of their next "rescue" target, thereby rendering police officials incapable of securing equal access to medical treatment for women who choose abortion. *New York State Nat'l*

tiffs argue, with some lack of clarity, that the putative right to an abortion is of such a fundamental character as to be guaranteed against all interference, not just governmental interference.[12] Such a claim is problematic, both because it is novel and because *Webster v. Reproductive Health Serv.,* —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) suggests that the law concerning a putative abortion right is in a state of flux.[13] Given this and given that there is another independent basis for relief under Section 1985(3), the Court concludes that it is unnecessary and imprudent to venture into this thicket. Courts should avoid constitutional questions where other grounds are available and dispositive of the issues presented. *See Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 571, 67 S.Ct. 1409, 1421, 91 L.Ed. 1666 (1947); *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936)

(Brandeis, J., concurring). Therefore, the Court expresses no view as to the merits of plaintiffs' claim premised on a fundamental right to an abortion.

### C. *Trespass*

■ 41. It is unlawful in Virginia, (i) to enter or remain on the property of another after having been forbidden to do so, (ii) to instigate or encourage others to enter or remain on the property of another knowing that such persons have been forbidden to do so, and (iii) to enter the property of another for the purpose of damaging such property or interfering with the rights of the owner, user or occupant of such property. Virginia Code Ann. §§ 18.2—119, *et seq.* (Repl.Vol.1988).

42. The undisputed record discloses that defendants (i) entered and remained on the property of some of plaintiffs after having been forbidden to do so, (ii) instigated and encouraged others to enter and re-

*Org. for Women,* 704 F.Supp. at 1260; *see also Great Am. Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 384, 99 S.Ct. 2345, 2355, 60 L.Ed.2d 957 (1979) ("[i]f private persons take conspiratorial action that prevents or hinders the constituted authorities of any state from giving or securing equal treatment, the private persons would cause those authorities to violate the 14th Amendment"). But plaintiffs did not argue this point and for the reasons noted in the text, *infra,* the Court need not reach the merits of this doubtful argument.

12. Though plaintiffs did not specify the source of such a fundamental privacy right, they may have meant the Ninth Amendment, for it was referred to in Justice Goldberg's concurring opinion in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and mentioned by Justice Blackmun in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Some commentators, too, have advocated that amendment as the source of an unenumerated right to privacy. *See* Redlich, *The Ninth Amendment as a Constitutional Prison,* 12 Harv.J.L. & Pub.Pol'y 23 (1989). But at least one commentator has sharply criticized the whole notion of grounding any right to an abortion in a fundamental constitutional privacy right. *See* BeVier, *What Privacy is Not,* 12 Harv. J.L. & Pub.Pol'y 99 (1989).

13. Although the Court noted that the facts of *Webster* did not present an appropriate occasion to overturn *Roe,* its decision left *Roe* ripe for attack. *See, Webster v. Reproductive Health Serv.,* —— U.S. ——, 109 S.Ct. 3040, 3058, 106

L.Ed.2d 410 (1989). Justice Rehnquist, speaking for the Court in *Webster,* explained, "*[s]tare decisis* is a cornerstone of our legal system, but it has less power in constitutional cases, where, save for constitutional amendments, this Court is the only body able to make needed changes. We have not refrained from reconsideration of a prior construction of the Constitution that has proved 'unsound in principle and unworkable in practice.' *We think the Roe trimester framework falls into that category ... Since the bounds [of Roe] are essentially indeterminate, the result has been a web of legal rules that have become increasingly intricate, resembling a code of regulations rather than a body of constitutional doctrine.*" *Webster,* 109 S.Ct. at 3056–57 (citations omitted) (emphasis added). For additional examples of the narrowing of *Roe see, Simopoulos v. Virginia,* 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983) (upholding a state statutory requirement that second trimester abortions be performed only in licensed clinics); *City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (women's fundamental right to abortion is not unqualified and must be balanced against important state interests); *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (upholding governmental regulations withholding public funds for nontherapeutic abortions); *Beal v. Doe,* 432 U.S. 454, 97 S.Ct. 2394, 53 L.Ed.2d 464 (1977) (Social Security Act does not require funding non-therapeutic abortions as a condition of participating in state medicare program).

main on that property knowing that such persons have been forbidden to do so, and (iii) entered that property for the purpose, at least, of interfering with the rights of the owners to conduct their business and of the users to obtain medical and counselling services. Indeed, these actions are vital to defendants' avowed purposes and goals.

43. It is well established that these trespass statutes prohibit the conduct at issue here. *Northern Virginia Women's Medical Center v. Balch*, 617 F.2d 1045, 1049 (4th Cir.1980) (abortion clinic's action against demonstrators based on violations of trespass statutes). And, evidence adduced at trial clearly establishes defendants' violations of the statutes in the past and the likelihood, unless enjoined, that such violations will occur in the future. Plaintiffs are, therefore, entitled to relief.

### D. Public Nuisance

44. The common law of Virginia recognizes public nuisance as an offense. *Tisdale v. Virginia*, 114 Va. 866, 77 S.E. 482 (1913). A public nuisance is an act or condition that unlawfully operates to injure an indefinite number of persons. *United States v. County Bd. of Arlington Cty.*, 487 F.Supp. 137 (E.D.Va.1979); *Ritholz v. Virginia*, 184 Va. 339, 35 S.E.2d 210, 214 (1945) ("any act, omission or use of property that is of itself hurtful to health, tranquility or morals or outrages the decency of a community is a nuisance"). Injury can include affecting the safety, health or morals of the public, or working a substantial annoyance, inconvenience or injury to the public in general. *County Bd. of Arlington Cty.*, 487 F.Supp. at 143. Individuals can sue to abate even if the public at large sustains injury from a public nuisance. *Harris v. Poulton*, 99 W.Va. 20, 127 S.E. 647 (1925).

45. In the absence of legislation, it is the province and duty of the courts to determine the existence of a public nuisance. *Stickley v. Givens*, 176 Va. 548, 11 S.E.2d 631 (1940). Once a court determines that a public nuisance exists, it may enjoin the nuisance in order to "restrain irreparable mischief, suppress oppressive litigation, or prevent a multiplicity of suits." *Switzer*

*v. McCulloch*, 76 Va. 777 (1882); *see also, Ritholz v. Virginia*, 184 Va. 339, 35 S.E.2d 210 (1945); *Mears v. Colonial Beach*, 166 Va. 278, 184 S.E. 175 (1936). Of course, as with equitable remedies in general, a court ought not to enjoin a nuisance, except where there is no adequate remedy at law, or where there is a likelihood of irreparable injury. *Genheimer v. Crystal Spring Land Co.*, 155 Va. 134, 154 S.E. 489 (1930); *Talley v. Tyree*, 41 Va. (2 Rob.) 500 (1843); *Wingfield v. Crenshaw*, 3 Hen. & M. (13 Va.) 245 (1809). The undisputed record discloses that by trespassing on to a clinic's property for the purpose of blocking ingress into and egress from the property, and by hindering use of the parking lots and adjacent streets defendants' "rescue" demonstrations have created a public nuisance. *See, New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989). Accordingly, it is conduct that this Court may properly enjoin.

### E. Tortious Interference with Business Relationships

46. The Court, having found a cause of action for injunctive relief under the state claims of trespass and public nuisance, need not reach the merits of this claim. Moreover, plaintiffs have not alleged facts sufficient to establish the elements of this cause of action. The elements of an action for tortious interference with contract rights include:

(i) the existence of a valid contractual relationship or business expectancy;

(ii) knowledge of the relationship or expectancy on the part of the interfering party;

(iii) intentional interference inducing or causing a breach of the relationship or expectancy; and

(iv) resultant damage to the party whose relationship or expectancy has been damaged.

*Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97 (1985).

47. Because the record is unclear whether defendants knew of the existence of any contract between the clinics and women seeking abortions and because re-

lief is granted on the other state claims, this claim is dismissed without prejudice. Plaintiffs are not precluded, therefore, from alleging and proving facts sufficient to support this cause of action in any future proceeding.

*Propriety of Injunctive Relief*

48. As plaintiffs have prevailed on three of their claims, the issue of appropriate relief is presented. Plaintiffs seek a permanent injunction against defendants, and those acting in concert with them, from trespassing on, sitting in, blocking, impeding or obstructing ingress into or egress from, any facility that provides legal abortion services and related medical and psychological counseling throughout the country.[14] Plaintiffs also seek to enjoin defendants from conducting demonstrations, in the vicinity of clinics, that have the effect of harassing and intimidating plaintiffs' patients and members. For the reasons that follow, the Court concludes that plaintiffs are entitled to a carefully tailored injunction, but that the precise relief requested is overbroad.

49. Permanent injunctive relief is appropriate where (i) there is no adequate remedy at law, (ii) the balance of the equities favors the moving party, and (iii) the public interest is served. *See New York State Nat'l Org. of Women,* 704 F.Supp. at 1262; *Southern Packaging & Storage Co., Inc. v. United States,* 588 F.Supp. 532, 544 (D.S.C.1984); *Nissan Motor Corp. v. Maryland Shipbuilding & Drydock Co.,* 544 F.Supp. 1104, 1122 (D.Md.1982), *aff'd* 742 F.2d 1449 (4th Cir. 1984); *LaDuke v. Nelson,* 560 F.Supp. 158, 162 (E.D.Wash.1982); *see also, Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co.,* 550 F.2d 189, 195 (4th Cir.1977). These requirements are met. Moreover, it is settled that "[p]erhaps the most significant single component in the judicial decision whether to exercise equity jurisdiction and grant permanent injunctive

relief is the court's discretion." 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2942 (1973), at 365. And it is the Court's view, in the exercise of its equity power, that this is an appropriate case for injunctive relief.

50. Plaintiffs have no adequate remedy at law. There is no adequate compensation in money damages that can remedy the damage from defendants' interference with plaintiffs' right to travel. Trial testimony amply supports the conclusion that women seeking abortions and counselling at abortion clinics are likely to suffer irreparable physical and emotional damage as a result of defendants' blockading of abortion facilities. Nor is the police enforcement of existing trespass statutes an adequate remedy. The inability of police officers to ensure access to clinics when confronted by defendants' "rescue" blockades warrants granting the additional injunctive remedy. *See New York State Nat'l Org. of Women,* 704 F.Supp. at 1262.

51. The Court concludes that the balance of the equities weighs decisively in plaintiffs' favor. Plaintiffs' activities, while morally objectionable to defendants, are nonetheless lawful. Defendants' "rescue" blockades are not lawful, as they involve violation of plaintiffs' rights under Section 1985(3), and under the Virginia law of trespass and nuisance.[15] The Court further concludes that the public interest is served by the issuance of a permanent injunction guaranteeing the public protection of the constitutional right to travel. Defendants' "rescue" demonstrations pose a significant and continuing threat to plaintiffs' right to travel. The lengthy and persistent history of "rescue" demonstrations, coupled with the recent violations of court orders, lead inescapably to the conclusion that plaintiffs face an immediate and continuing threat to their rights. Thus, the Court concludes that permanent injunctive

---

**14.** Plaintiffs also seek damages under Section 1985(3). But plaintiffs offered no evidence as to the existence or amount of damage suffered. Accordingly, the Court does not award damages.

**15.** This is not a case where rights clash and where resolution requires a balancing of or choosing between rights. Instead, this is a case where defendants' blockading conduct is unlawful and unprotected and it is plaintiffs' rights that are in danger of infringement.

relief is appropriate in the circumstances at bar. Specifically, the Court has ordered that,

(1) The individual defendants, and defendant Operation Rescue, its officers, agents, members, servants, employees, and attorneys, and any persons acting in active concert or participation with it who receive actual notice of this Permanent Injunction, by personal service or otherwise, are ENJOINED and RESTRAINED from, in any manner or by any means, trespassing on, blockading, impeding or obstructing access to or egress from the following premises: Alexandria Women's Health Center, 101 South Whiting Street, Alexandria, Virginia; Commonwealth Women's Clinic, 916 West Broad Street, Falls Church, Virginia; Gynecare Associates, 312 South Washington Street, Alexandria, Virginia; Metro Medical Center, Inc. d/b/a Annandale Women's Center, 2871 Duke Street, Alexandria, Virginia; NOVA Women's Medical Center, 9900 Main Street, Suite 305, Fairfax, Virginia; Planned Parenthood of Metropolitan Washington, D.C., Inc., 5622 Columbia Pike, Suite 303, Falls Church, Virginia; Planned Parenthood of Metropolitan Washington, D.C., Inc., 10875 Main Street, Suite 208, Fairfax, Virginia; Prince William Women's Clinic, 9384–C Forestwood Lane, Manassas, Virginia.

(2) The individual defendants, and defendant Operation Rescue, its officers, agents, members, servants, employees, and attorneys, and any persons acting in active concert or participation with it who receive actual notice of this Permanent Injunction, by personal service or otherwise, are ENJOINED and RESTRAINED from, in any manner or by any means, trespassing on, blockading, impeding or obstructing access to or egress from any facility at which abortions, family planning or gynecological services are provided in Arlington County, Fairfax County, City of Fairfax, City of Falls Church, Loudoun County, Prince William County or the City of Alexandria.

52. Plaintiffs' request for nationwide injunctive relief is overbroad. Even assuming, *arguendo*, that plaintiffs have shown a need for such expansive relief, the practical problems of enforcement for violations in far-off locations, coupled with the variation in state laws and enforcement capability, militate convincingly against granting such relief. Moreover, it appears that courts in other jurisdictions have already issued injunctive relief in the face of "rescue" demonstrations. Violations of those orders are properly resolved in the issuing courts and there is no need for an additional layer of injunctive relief.

53. Plaintiffs' request is also overbroad in seeking to enjoin those "rescue" activities that tend to intimidate, harass or disturb patients or potential patients of the clinics. Defendants have a significant First Amendment right to express their views on the vitally important issue of abortion and nothing in the permanent injunction should be construed to limit that right. Defendants' First Amendment right to express their views cannot be curtailed or limited because some persons are timid or reluctant to hear expressions of defendants' views on the issue of abortion.[16] Thus injunctive relief must not abridge defendants' First Amendment rights to express their abortion views in an appropriate manner in the vicinity of abortion clinics. At the same time, however, the defendants may not use the First Amendment as an excuse to engage in unlawful conduct or to infringe a person's right of access to an abortion clinic. "Rescue" blockades that involve trespass, denial of access to the clinics, and defacement or damage to clinic property cannot be shielded by the First Amendment.

**16.** Indeed, the First Amendment concept of a "free marketplace of ideas," taken seriously, necessarily entails that a citizen of a democracy has a duty to listen open-mindedly to opposing views on vital issues. It was distressing, therefore, to hear one of NOW's supporters testify at trial that he declined an invitation to engage in a discussion on the merits of the abortion issue with one of the defendants. Yet it is precisely this type of discussion between persons with opposing views that is contemplated by the First Amendment and is necessary as a first step in reaching a societal accommodation on this issue.

54. Plaintiffs' request for injunctive relief is overbroad in yet another respect. Plaintiffs requested the Court to order defendant Operation Rescue to mail to its entire membership, in its newsletter or otherwise, notice of the permanent injunction and its terms. Because Operation Rescue claims nationwide membership and because the permanent injunctive relief ordered by the Court is limited to the Northern Virginia area, national mail notice, through a newsletter or otherwise, is unnecessary. Instead, the Court will require defendants, their members, servants, employees and attorneys or any persons acting in concert with them to give notice of the injunction and its terms to all persons who assemble to participate in "rescue" demonstrations or similar events organized or promoted by defendants in the Northern Virginia localities.[17] In connection with this requirement, the Court will also direct defendants to file with the Court and serve on plaintiffs' counsel an affidavit establishing that the required notice concerning this injunction was given and describing with particularity the manner in which notice was given.

55. Similarly, the Court also concludes that it is appropriate for the permanent injunction to give notice of the likely consequences of a violation of its terms. To this end, the permanent injunction includes the following provision:

> The individual defendants, and defendant Operation Rescue, its officers, agents, members, servants, employees, and attorneys or any persons acting in active concert or participation with it who receive actual notice of this Permanent Injunction by personal service or otherwise and who violate the provisions of this Permanent Injunction and are held in contempt of court, may be imprisoned and fined $1,500. The Court may impose greater or lesser fines in the event of aggravating, mitigating or extenuating circumstances.

56. Moreover, since circumstances may change, the Court provided that the permanent injunction will expire at 5:00 pm on July 31, 1990, unless the plaintiffs show good cause for its extension.

### Conclusion

57. Plaintiffs claim attorney's fees, pursuant to 42 U.S.C. § 1988. The purpose of Section 1988 is to "ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (citations omitted). A Court in a Section 1985 action may, therefore, in its discretion, "allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs," pursuant to Section 1988. *Hensley*, 461 U.S. at 424, 103 S.Ct. at 1935. "A plaintiff must be a 'prevailing plaintiff' to recover an attorney's fee" under this section. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939 (footnote omitted). Plaintiffs typically are considered "prevailing parties" if "they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939 (citations omitted). In this case, the plaintiffs have substantially prevailed.

58. The amount of attorney's fees awarded is to be determined on the basis of the facts of each case. *Hensley*, 461 U.S. at 429, 103 S.Ct. at 1937. Accordingly, the Court has directed the parties to submit supplemental memoranda on the issue of the appropriate amount of attorney's fees, if any.

---

**17.** This requirement does not impermissibly infringe defendants' First Amendment rights. It does not unconstitutionally require defendants to associate with speech with which they may disagree. *Compare Pacific Gas & Elec. Co. v. Public Util. Comm'n of California*, 475 U.S. 1, 15, 106 S.Ct. 903, 911, 89 L.Ed.2d 1 (1986) (holding unconstitutional Commission's requirement that utility company enclose third-party newsletters in utility's billing envelopes). In *Pacific Gas*, the enclosure requirement was the Commission's overbroad means of furthering the state's interest in dissemination of utility rate information; the requirement was not pursuant to a court's narrowly tailored injunction.