NATIONAL ORGANIZATION
FOR WOMEN, et al.

v.

OPERATION RESCUE,
et al., Appellants.

NATIONAL ORGANIZATION FOR WOM-
EN; 51st State National Organization
for Women; Maryland National Organi-
zation for Women; Virginia National
Organization for Women; Planned Par-
enthood of Metropolitan Washington,
D.C., Inc.; National Abortion Federa-
tion; Commonwealth Women's Clinic;
Capitol Women's Center, Inc.; Hillcrest
Women's Surgi–Center, Plaintiffs–Ap-
pellees,

Washington Surgi–Clinic; New Summit
Medical Center, Incorporated; Washing-
ton Hospital Center Corporation, Inter-
venor Plaintiffs–Appellees,

v.

OPERATION RESCUE; Project Rescue;
D.C. Project; Veterans Campaign for
Life; Randall Terry; Patrick Mahoney;
Clifford Gannett; Michael McMonagle;
Michael Bray; Jane Bray, Defendants–
Appellants,

Joseph Slovenec; Phillip Vollman; The
Christian Defense Coalition; Rusty
Thomas, Defendants–Appellants,

Keith Tucci; Jeff White; Michael King;
Mark Dubioski; Robert Jewitt,
Defendants–Appellants.

Nos. 91–7001, 93–7058.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1994.

Decided Oct. 18, 1994.

David H. Shapiro argued the cause, for appellants. With him on the briefs was Richard L. Swick.

D. Jean Veta argued the cause, for appellees. With her on the brief were Laurence J. Eisenstein and Deborah A. Ellis.

Before WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Operation Rescue and various individuals appeal from an order of the United States District Court for the District of Columbia issuing a permanent injunction prohibiting them from "in any manner, or by any means,

trespassing on, blockading, impeding or obstructing access to or egress from any facility at which abortions, family planning, or gynecological services are performed in the District of Columbia," and from "inducing, encouraging, directing, aiding, or abetting others" to engage in such activities. Appellants also appeal from orders of the district court holding them in civil contempt for acts in violation of the injunction.

We affirm the district court's determination that it properly exercised subject-matter jurisdiction over the pendent District of Columbia trespass and public nuisance claims upon which the injunction is based, but remand to the district court with instructions to modify the language of the injunction to conform to the district court's expressed intention to enjoin appellants from "inciting" illegal acts. We affirm those contempt sanctions that compensate appellees for actual damages, together with per diem sanctions to compel appellant Keith Tucci to appear in court. However, we vacate the remaining contempt sanctions and remand to the district court for further proceedings consistent with the Supreme Court's opinion in *International Union, United Mine Workers of America v. Bagwell,* — U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). Finally, we vacate the award of attorneys' fees to appellees under 28 U.S.C. § 1988.

## I. BACKGROUND

This case arises out of a series of anti-abortion protests by Operation Rescue and its supporters (hereinafter "Operation Rescue" or "appellants") involving physical blockades of clinics providing abortion services. Such blockades, described as "rescues" by Operation Rescue, have been conducted in the District of Columbia, surrounding Virginia and Maryland communities, and other metropolitan areas throughout the country dating back at least to 1988. Because these blockades physically prevent ingress to and egress from clinics for many hours or even day-long periods, patients, physicians, and medical staff are prevented from receiving or providing medical and counseling services, creating a risk of physical or mental harm to patients. *NOW v.*

*Operation Rescue,* 747 F.Supp. 760, 764 (D.D.C.1990) (quoting and giving preclusive effect to findings of fact in parallel Virginia case, *NOW v. Operation Rescue,* 726 F.Supp. 1483, 1488–90 (E.D.Va.1989), *aff'd,* 914 F.2d 582 (4th Cir.1990), *rev'd in part sub nom. Bray v. Alexandria Women's Health Clinic,* — U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993)). In addition, some "rescues" have involved trespass on, and damage to, clinic property. 747 F.Supp. at 765.

The "rescues" that precipitated this lawsuit took place at clinics in Washington, D.C. on November 10–12 and 18–20, 1989, despite a preliminary injunction prohibiting the blocking of access to clinics. Additional blockades took place on January 20–22, 1992, April 4, 1992, and January 21 and 23, 1993, despite permanent injunctions then in effect.

In anticipation of "rescues" planned for November 11, 1989, the National Organization for Women ("NOW"), its affiliates, and several clinics in the District of Columbia commenced this action on October 27, 1989, seeking injunctive relief in federal district court to prohibit the blockading of the clinics. Their complaint alleged violations of 42 U.S.C. § 1985(3) (conspiracy to violate plaintiffs' constitutional rights to travel and to privacy), and included pendent District of Columbia claims of trespass, public nuisance, and tortious interference with business relationships.

The district court issued a preliminary injunction on November 8, 1989, *NOW v. Operation Rescue,* 726 F.Supp. 300 (D.D.C.1989). The preliminary injunction was based solely on the pendent local law claims; the district court deferred any decision on the federal claims, which it viewed as "unsettled" but nonetheless sufficiently substantial to confer federal jurisdiction. Subsequently, the district court issued a permanent injunction on January 26, 1990, and a revised permanent injunction, supported by a memorandum opinion, on July 31, 1990, *NOW v. Operation Rescue,* 747 F.Supp. 760 (D.D.C.1990), granting summary judgment to NOW on both its federal § 1985(3) claims and pendent local law claims of trespass and public nuisance, while dismissing the claim of tortious interference with business relationships. The

court based its actions substantially upon the preclusive effect of findings of fact and conclusions of law in the related, previously-decided Virginia case, *NOW v. Operation Rescue*, 726 F.Supp. 1483 (E.D.Va.1989), *aff'd*, 914 F.2d 582 (4th Cir.1990), *rev'd in part sub nom. Bray v. Alexandria Women's Health Clinic*, — U.S. —, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).

On July 31, 1990, the district court cited Operation Rescue and various individuals for civil contempt based on their actions in connection with the November 1989 blockades, which the court found to be in violation of the preliminary injunction. *NOW v. Operation Rescue*, 747 F.Supp. 772 (D.D.C.1990). The district court assessed fines to compensate the clinics for damages resulting from interference with their business and destruction of their property, against Operation Rescue, Clifford Gannett, Joseph Foreman, Susan Odom, and Michael McMonagle, jointly and severally, $1,680 for damages to the Hillcrest Clinic, $533 for damages to the Capitol Women's Center, and $3,800 for damages to the Washington Surgi-Clinic. The district court also established a schedule of escalating prospective fines for continued violations of the injunction, payable to the clinics; the court characterized these contempt sanctions as "coercive" and therefore civil in nature.

Operation Rescue filed timely notices of appeal from both the injunction and the contempt citations. These appeals were stayed pending Supreme Court resolution of the related Virginia case. On January 13, 1993, the Supreme Court held in *Bray v. Alexandria Women's Health Clinic*, — U.S. —, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), that plaintiffs similarly situated to appellees in this case had no federal cause of action under 42 U.S.C. § 1985(3), but that plaintiffs' § 1985(3) claims were "not ... 'wholly insubstantial and frivolous,'" and therefore sufficient to confer subject-matter jurisdiction over both the federal and pendent state claims. — U.S. at —, 113 S.Ct. at 768. On March 16, 1993, the district court ruled that it would nonetheless retain pendent jurisdiction over surviving local law claims in this case, and issued a second contempt order holding various appellants in contempt

for violations of the injunction in connection with blockades conducted on January 20–22, 1992, and April 4, 1992. *NOW v. Operation Rescue*, 816 F.Supp. 729 (D.D.C.1993). This second contempt order cited "knowing and deliberate" violations of the injunction, and imposed fines in accordance with the previously-announced schedule of sanctions: against Operation Rescue National and Operation Rescue jointly, $100,000; against Clifford Gannett, $15,000; against Patrick Mahoney, $10,000; and against Keith Tucci, $15,000. The district court also fined Operation Rescue and Operation Rescue National an additional $1,010 to compensate the Hillcrest Women's Surgi-Center for property damage, and fined Keith Tucci an additional $41,600 for refusing to appear in court in violation of the court's order ($100 per day for 416 days). On April 28, 1993, the district court amended its March 16 order to fine Joseph Foreman $5,000 for violations of the injunction. The district court characterized all these fines as civil contempt sanctions.

On March 12, 1993, NOW initiated yet another round of contempt proceedings based on blockades conducted on January 21 and 23, 1993. Because appellants had not yet paid any of the fines ordered as contempt sanctions, the district court on March 31, 1993, requested supplemental briefing on enforcement of its orders, and appointed an amicus to consider First Amendment implications of its injunction. On July 29, 1993, the district court ruled that the injunction was constitutionally permissible under the First Amendment.

On August 11, 1993, all of Operation Rescue's pending appeals were consolidated by this court.

## II. DISCUSSION

Operation Rescue raises six issues on appeal: (1) Did the district court properly take pendent jurisdiction over District of Columbia trespass and public nuisance claims, and did it properly retain pendent jurisdiction even after the federal § 1985(3) claim had been dismissed? (2) Did the district court err in failing to vacate the award of attorneys' fees to appellees under 42 U.S.C. § 1988 after appellees' § 1985(3) cause of

action failed? (3) Did the district court's injunctions prohibiting Operation Rescue and its supporters from blockading abortion clinics and "inducing, encouraging, directing, aiding, or abetting others" to blockade clinics violate appellants' First Amendment rights of free speech? (4) Did the district court's order that contempt fines be paid to appellee clinics violate appellants' First Amendment rights by compelling them to support causes and practices they find ideologically objectionable and morally repugnant? (5) Did the district court err in characterizing contempt fines payable to appellees as civil contempt sanctions? (6) Did appellees satisfactorily prove damages to clinic property to justify the award of a compensatory fine?

### A. Pendent Jurisdiction

Operation Rescue contends that the entire case must be dismissed for lack of subject-matter jurisdiction. Specifically, Operation Rescue maintains that the district court should not have taken pendent jurisdiction over NOW's trespass and public nuisance claims under District of Columbia law, and should not have retained pendent jurisdiction over these claims after NOW's federal cause of action under 42 U.S.C. § 1985(3) had been dismissed.

The Supreme Court expressly rejected this argument in the related Virginia case, *Bray v. Alexandria Women's Health Clinic,* —— U.S. at ——, 113 S.Ct. at 768. After holding that similarly-situated respondents had no federal cause of action under § 1985(3), the Court specifically rejected petitioners' contention that a similar injunction in that case should be vacated because the district court lacked subject-matter jurisdiction over the action, including pendent state law claims. The Court held that "[w]hile respondents' sec. 1985(3) causes of action fail, they were not, prior to our deciding of this case, 'wholly insubstantial and frivolous' [citations omitted], so as to deprive the District Court of jurisdiction." *Id.* The Court then remanded to the district court to determine whether the pendent state law claims standing alone were sufficient to support the injunction. *Id.*

■ Under *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct.

1130, 16 L.Ed.2d 218 (1966), we use a two-part test to determine whether a federal court should exercise pendent jurisdiction over a state law claim. First, the district court must determine that it has *power* to decide a state law claim joined to a federal claim. To satisfy this prong, the federal claim must be substantial, and the state and federal claims must "derive from a common nucleus of operative fact" such that it "would ordinarily be expected to try them all in one judicial proceeding." *Id.* at 725, 86 S.Ct. at 1138. Second, the district court must exercise its *discretion,* weighing factors of judicial economy, convenience, fairness to litigants, and comity, as to whether the court should retain the case. *Id.* at 726, 86 S.Ct. at 1139. *See also Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768, 772 (D.C.Cir.1982); *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988).

■ Here, it is clear that at the outset of this litigation, the district court had *power* to hear the pendent local law claims. The Supreme Court itself held in *Bray* that under similar facts, identical federal § 1985(3) claims were sufficiently substantial at a comparable stage of the litigation to support federal jurisdiction. And here, as in *Bray,* the local trespass and nuisance claims certainly arose out of a "common nucleus of operative fact" such that it would ordinarily be expected that they would be tried in the same proceeding with the federal claim. Nor did the district court abuse its *discretion* in exercising pendent jurisdiction of local law claims while the federal claims were before it. Indeed, this appears to be a case tailor-made for the exercise of pendent jurisdiction. The policies of judicial economy, convenience, and fairness to litigants are served by allowing the appellees to seek a single injunction based on both federal and local law claims arising out of a single set of facts and events, rather than pursuing parallel actions in both federal and District of Columbia courts. The district court properly exercised its discretion to invoke pendent jurisdiction after weighing both the power and discretionary prongs of pendent jurisdiction doctrine. *See* 726 F.Supp. at 304 (because "federal claims

are not insubstantial" and "federal and state claims are such that they would ordinarily be tried in one judicial proceeding," local law claims are "cognizable in federal court"; decision on pendent jurisdiction is "within the discretion of the court, and is based on considerations of 'judicial economy, convenience, and fairness to litigants' ").

■ It is true that the district court's opinion did not expressly discuss the question of comity, and specifically whether the case involved unsettled issues of local law. *Cf. Financial General,* 680 F.2d at 775–78 (when local law is "novel and unsettled," comity may be decisive factor in the discretionary balance, weighed against considerations of judicial economy, convenience, and fairness to litigants). But there is no indication at all that the pendent claims in this case involved "novel and unsettled" questions of local law. The central legal issues are straightforward questions of trespass and common law public nuisance, hardly "novel and unsettled" areas of the law in the District of Columbia. Indeed, Operation Rescue can identify no specific question of "unsettled" local law implicated in this case. Instead, its argument rests on the assertion that the district court relied primarily upon Virginia rather than District of Columbia precedents in reaching its conclusions of law, which Operation Rescue cites as "conclusive evidence" that District of Columbia law on these subjects must be "unsettled." Appellants' Brief at 13–14. We read the record differently. The district court explicitly compared District of Columbia and Virginia trespass statutes and public nuisance precedents, and after determining that the legal standards for both causes of action are "substantially identical" in the two jurisdictions, gave preclusive effect to the conclusions of law reached in the related Virginia litigation. *See* 747 F.Supp. at 767–68. On our reading, the district court simply reached the conclusion that District of Columbia law was quite clearcut on both causes of action. We do not agree that the issues of District of Columbia law were so "novel" and "unsettled" that the district court's decision to exercise pendent jurisdiction amounts to an abuse of discretion. We therefore conclude that the district court properly exercised pendent jurisdiction over local law claims at the outset of this litigation.

We turn next to Operation Rescue's contention that the district court abused its discretion by declining to dismiss NOW's local law claims after the federal § 1985(3) claims had been dismissed. Operation Rescue relies upon *Financial General* for the proposition that local law claims should be dismissed if the federal claims are dismissed. But *Financial General* does not stand for such a broad proposition. In *Financial General,* we said that while it will often be appropriate to dismiss state law claims if the federal claims are dismissed *before* trial, even this rule is not "ironclad," for "[i]f extensive pretrial proceedings have already occurred before dismissal of the federal claims, considerations of 'judicial economy, convenience, and fairness' may support retention of pendent jurisdiction by the federal court rather than dismissal of state claims, which would require the parties to bring a new civil action in state court." *Financial General,* 680 F.2d at 773. In *Financial General,* we held that the district court had abused its discretion by retaining pendent jurisdiction over claims involving standards of an attorney's fiduciary duties and remedies for breach thereof, "a completely unsettled area of local law" that had "never been addressed by the District of Columbia courts," 680 F.2d at 777–78, after the plaintiff's federal claims had been dismissed before trial. The district court there based its decision to retain pendent jurisdiction solely on considerations of judicial economy, specifically the fact that extensive pretrial discovery had already occurred. 680 F.2d at 774. We found that the district court had "overestimated the judicial economy and convenience to be gained by retaining pendent jurisdiction," since the District of Columbia's rules of discovery and evidence are substantially similar to federal rules, and concerns about the admissibility of evidence produced during discovery could be alleviated by conditioning dismissal upon the parties' agreement to waive evidentiary objections in District of Columbia proceedings. 680 F.2d at 774–75.

Operation Rescue asserts a direct parallel between *Financial General* and the present case, arguing that the district court here retained pendent jurisdiction solely on the basis of judicial economy, and that the case involves novel and unsettled issues of local law. But as we have already concluded, the present case involves no similarly unsettled issues of local law. Furthermore the present litigation was at a far more advanced stage than *Financial General* when the federal claims were dismissed. Unlike *Financial General* where all that had taken place before the federal claims were dismissed was pretrial discovery, here the local law claims had already been adjudicated on the merits. Indeed, by the time the Supreme Court decided *Bray* (necessitating dismissal of NOW's federal claims), the district court had·issued a preliminary injunction, a permanent injunction and a revised permanent injunction supported by an opinion deciding the merits of both federal and local causes of action on summary judgment in favor of NOW, held various appellants in contempt for violations of the injunction, established a schedule of sanctions for continued violations of the injunction, and conducted hearings on a second and third round of contempt proceedings for additional violations of the injunction. The issues had been fully briefed, hearings had been held, and all substantive questions of District of Columbia law had already been resolved. All that remained for the Court to do was to find a way to compel obviously recalcitrant defendants to obey the injunction and pay contempt fines. At this advanced stage of the litigation, the interest of judicial economy weighed far more heavily than in *Financial General.* And unlike *Financial General,* the district court's decision to retain pendent jurisdiction here was not solely upon considerations of judicial economy, but instead was essential to preserve the integrity of the judicial process and to ensure fundamental fairness to litigants whose rights had already been conclusively adjudicated. The district court expressly determined that already-decided issues of District of Columbia law "provide a sufficient basis for retaining federal jurisdiction, enforcing the Injunction, protecting the previously established rights of plaintiffs, and vindicating the vital authority of a United States District Court." 816 F.Supp. at 730–31. In view of the advanced stage to which the litigation had progressed by the time *Bray* was decided, as well as the settled nature of the local law, comity considerations would be secondary at best.

### B. *Attorneys' Fees*

On January 4, 1991, after having decided both federal § 1985(3) claims and pendent trespass and public nuisance claims in favor of NOW, the district court awarded NOW attorneys' fees pursuant to 42 U.S.C. § 1988, the Civil Rights Attorney's Fee Award Act of 1976, under which "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" in an action to enforce the provisions of any of various federal civil rights statutes, including 42 U.S.C. § 1985. Joint Appendix ("J.A.") 123–30. The award here included fees for work done on appellees' pendent District of Columbia law claims, as well as its 42 U.S.C. § 1985(3) claim. An award of attorneys' fees may properly extend to related pendent state law claims if the party also prevails on its federal civil rights claim. *Hensley v. Eckerhart,* 461 U.S. 424, 434–35, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). Here, however, the district court's judgment in favor of appellees on their § 1985(3) federal civil rights claim was subsequently vacated, J.A. 141, and consequently appellees cannot be said to have "prevailed" on that claim. Therefore, the essential predicate for an award of attorneys' fees under § 1988 no longer exists. Although courts have sometimes exercised their discretion to award attorneys' fees to plaintiffs who prevail on pendent state claims when the court has not reached the merits of their federal civil rights claims, *see, e.g., Carreras v. City of Anaheim,* 768 F.2d 1039 (9th Cir.1985), here the court ultimately decided plaintiffs had no federal cause of action at all. We agree with the view of our sister circuits, which have uniformly held that a plaintiff who loses on the merits of its federal civil rights claim is not a "prevailing party" for purposes of an award of attorneys' fees under 42 U.S.C.

§ 1988, even if it prevails on a related pendent state law claim. *See Mateyko v. Felix,* 924 F.2d 824, 828–29 (9th Cir.1990) ("Where, as here, there has been a decision adverse to plaintiff on the [federal civil rights] claim, section 1988 does not authorize the award of attorney's fees."), *cert. denied,* — U.S. —, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991), and cases cited therein; *Bray v. Alexandria Women's Health Clinic,* — U.S. at — —, 113 S.Ct. at 767–68 ("Because respondents [similarly situated to appellants here] were not entitled to relief under sec. 1985(3), they were also not entitled to attorney's fees and costs under 42 U.S.C. § 1988."). We therefore vacate the district court's order awarding attorneys' fees to appellees.

## C. First Amendment Claims

### 1. Overinclusiveness and Vagueness

Operation Rescue contends the injunction sweeps too broadly, burdening protected as well as unprotected speech. Specifically, Operation Rescue argues that those parts of the injunction that prohibit appellants from "inducing" or "encouraging" others to blockade clinics are impermissibly overinclusive,[1] "prevent[ing] appellants from engaging in any anti-abortion activity which could conceivably lead to sit-ins in front of abortion clinics" and "chill[ing] all such [anti-abortion] speech with the threat of heavy fines." Appellants' Brief at 23. Separately, Operation Rescue contends the injunction must fall on grounds of vagueness, because its broad proscriptions against "inducing" and "encouraging" blockades leave appellants without adequate notice as to precisely what speech or speech-related conduct will be deemed to violate the order. Appellants' Brief at 24–25. Since Operation Rescue's overinclusiveness and vagueness claims involve, at their core, virtually identical claims that imprecisely worded portions of the injunction unnecessarily burden appellants' protected speech, we shall consider them together.

In a recent case involving a Florida court's injunction to protect abortion clinics against unlawful blockades, the Supreme Court announced a new standard for reviewing content-neutral injunctions restricting speech, under which the court must determine "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen v. Women's Health Center, Inc.,* — U.S. —, —, 114 S.Ct. 2516, 2525, 129 L.Ed.2d 593 (1994). The *Madsen* Court noted that this standard is less stringent than strict scrutiny, but more stringent than the standard for reviewing content-neutral, generally-applicable statutes restricting the time, place, or manner of speech, which must be "narrowly tailored to serve a significant governmental interest." — U.S. at — – —, 114 S.Ct. at 2524–26. The Court explained that injunctions should be held to this stricter standard because they "carry greater risks of censorship and discriminatory application than do general ordinances." *Id.* at —, 114 S.Ct. at 2524.

In *Madsen,* applying the "burden no more speech than necessary" standard, the Supreme Court upheld provisions of an injunction creating a 36–foot demonstration-free buffer zone on public property around clinic entrances, *id.* at —, 114 S.Ct. at 2526–27, and restricting the noise levels of anti-abortion demonstrations in the immediate vicinity of the clinics, *id.* at —, 114 S.Ct. at 2528. But the Court rejected provisions extending the buffer zone to private property adjacent to the clinics, *id.* at —, 114 S.Ct. at 2528, banning "images observable" on demonstration signs, *id.* at — – —, 114 S.Ct. at 2528–29, prohibiting demonstrators from "physically approaching" clinic patients within 300 feet of the clinic, *id.* at —, 114 S.Ct. at 2529, and creating a 300–foot buffer zone around the residences of clinic staff, *id.* at — – —, 114 S.Ct. at 2529–30. These latter provisions, the Court said, burdened more speech than was necessary to serve the

---

1. Operation Rescue styles this an "overbreadth" claim, although it does not fit the technical contours of overbreadth doctrine which typically concerns facial challenges to statutes or regulations that impermissibly burden *third parties'* protected speech interests. *See New York State* *Club Ass'n v. New York City,* 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988). We shall treat it instead as a simple contention that the injunction is overinclusive, insofar as it impermissibly burdens appellants' own protected speech interests.

government's significant interests in "protecting a woman's freedom to seek lawful medical or counseling services," "ensuring the public safety and order," "promoting the free flow of traffic on public streets and sidewalks," "protecting ... property rights," and protecting "the psychological ... [and] physical well-being of the patient held 'captive' by medical circumstance." *Id.* at ——, 114 S.Ct. at 2526.

■ As a threshold matter, we must first determine whether the injunction at issue here, like that in *Madsen,* is content neutral. We conclude that it is. In assaying whether a restriction on speech is content neutral,

> [t]he principal inquiry ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration.... Government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech.

*Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (internal quotations and citations omitted). We thus "look to the government's purpose as the threshold consideration." *Madsen,* —— U.S. at ——, 114 S.Ct. at 2523; *see also Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2461, 129 L.Ed.2d 497 (1994) ("[E]ven a regulation neutral on its face may be content-based if its manifest purpose is to regulate speech because of the message it conveys."). The district court identified several purposes to be served by this injunction, including protecting appellees' property rights, J.A. 79, protecting the "rights of ... [appellees' patients] to obtain medical and counselling services," *id.,* protecting the free flow of traffic on streets and sidewalks, *id.,* and "prevent[ing] irreparable physical and emotional injury to plaintiffs' patients and members" as a result of their inability to receive and render medical and counseling services. J.A. 91. All these justifications are neutral with respect to the content of appellants' speech, and do not even remotely suggest a hidden purpose to regulate speech because of a disagreement with appellants' message. As in

*Madsen,* "the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based." —— U.S. at ——, 114 S.Ct. at 2524.

■ Next we consider whether the injunction serves a "significant governmental interest." We conclude that it does. Examining the purposes of the injunction articulated by the district court and discussed in the preceding paragraph, we find that the injunction serves a combination of significant governmental interests virtually identical to those in *Madsen,* which the Supreme Court found "quite sufficient to justify an appropriately tailored injunction...." —— U.S. at ——, 114 S.Ct. at 2526.

■ We now proceed to consider whether the injunction here is "appropriately tailored" to serve these significant governmental interests. As the parties concede in their briefs and at oral argument, the first part of the injunction, which prohibits "trespassing on, blockading, impeding or obstructing access to or egress from" the clinics, is aimed at unlawful conduct and does not seriously implicate First Amendment concerns. Appellants have no general First Amendment right to trespass on private property, *see Lloyd Corp. v. Tanner,* 407 U.S. 551, 568, 92 S.Ct. 2219, 2228–29, 33 L.Ed.2d 131 (1972), or to physically block access to private property as a means of protest, *see Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 464–65, 13 L.Ed.2d 471 (1965). But the second part of the injunction, prohibiting appellants from "inducing, encouraging, directing, aiding, or abetting others" to engage in the prohibited conduct, reaches appellants' speech and consequently raises more serious First Amendment concerns.

■ Even here, however, the provisions prohibiting "directing, aiding, or abetting" illegal trespasses or blockades appear unproblematic. Many criminal statutes prohibit directing, aiding, or abetting illegal acts, even though the directing, aiding, or abetting may be carried out through speech. For example, the general federal criminal "aiding and abetting" statute, 18 U.S.C. § 2(a), provides that "Whoever ... aids, abets, counsels, com-

mands, induces or procures ... [the] commission [of an offense against the United States] is punishable as a principal." Indeed, "aiding" and "abetting" are terms of art in the criminal law, their meanings polished by decades of judicial gloss. *See, e.g., United States v. Raper*, 676 F.2d 841, 849 (D.C.Cir. 1982) (outlining elements of "aiding or abetting" offenses). That "aiding and abetting" of an illegal act may be carried out through speech is no bar to its illegality. *See, e.g., United States v. Barnett*, 667 F.2d 835, 842 (9th Cir.1982) ("The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose. Crimes, including that of aiding and abetting, frequently involve the use of speech...."); *United States v. Buttorff*, 572 F.2d 619 (8th Cir.) (upholding conviction for "aiding and abetting" the filing of false income tax returns by giving specific instructions at a large public gathering), *cert. denied*, 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978). "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949).

Although "directing" may not enjoy a similar exalted status in the language of our jurisprudence, it suffers from neither overinclusiveness nor vagueness. Indeed, one who intentionally and successfully "directs" another to commit an unlawful act also may "aid" or "abet" the commission of the act. *Cf. Raper*, 676 F.2d at 849 ("What is required on the part of the aider is sufficient knowledge and participation to indicate that he knowingly and willfully participated in the offense in a manner that indicated he intended to make it succeed."). In addition, the federal "aiding and abetting" statute imposes criminal liability for the "command[ ]" of illegal acts, a prohibition that appears to cover "directing." Finally, note that 18 U.S.C. § 2(b) also appears to prohibit directing of criminal acts: "Whoever willfully causes an act to be done which if directly done by him or another would be an offense against the

United States, is punishable as a principal." Thus, "directing" another to commit an unlawful act is probably proscribed under the rubric of "willfully caus[ing] the act to be done" and subjects the director to criminal liability under the federal statute. In any event, we believe the injunction's prohibition on "directing" others to commit unlawful trespasses or blockades is sufficiently precise and narrow in scope to withstand challenge on overinclusiveness or vagueness grounds.

Operation Rescue's central quarrel with the injunctions is not with the "directing, aiding, or abetting" language, however, but with language prohibiting appellants from "inducing" and "encouraging" others to engage in trespassing or blockading clinics. Appellants' Brief at 19–23. In their view, these provisions are broad enough to encompass ordinary fundraising and organizing activities, if those activities facilitate anti-abortion demonstrations that ultimately include illegal sit-ins by overzealous demonstrators. Operation Rescue analogizes this case to *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 926–29, 102 S.Ct. 3409, 3432–34, 73 L.Ed.2d 1215 (1982), where the Supreme Court held on First Amendment grounds that civil rights leaders who organized and publicly advocated a legal boycott of white-owned businesses could not be subject to civil liability for illegal acts which the boycott leaders had not specifically incited, authorized or directed. Moreover, Operation Rescue argues, the "inducing" and "encouraging" language in the present injunction could proscribe mere abstract advocacy of illegal sit-ins, in violation of the principles enunciated in *Brandenburg v. Ohio*, 395 U.S. 444, 447–48, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969) (abstract advocacy of unlawful activity may not be prohibited, but incitement to imminent unlawful action is not protected by First Amendment).

Taken in isolation, the terms "inducing" and "encouraging" may seem capable of such broad readings. Note, however, that like "aiding" and "abetting," these terms come with their own impressive legal pedigree. "Inducing," for example, also appears in the text of the federal "aiding and abetting" statute, 18 U.S.C. § 2(a) ("Whoever ... aids,

abets, counsels, commands, *induces,* or procures ... commission [of an unlawful act], is punishable as a principal.") (emphasis added). And some courts have said that with the requisite mental state, "encouraging" another who successfully completes an unlawful act constitutes "abetting." *See, e.g., United States v. Barnett,* 667 F.2d at 841 ("An abettor is one 'who, with *mens rea,* ... commands, counsels or otherwise *encourages* the perpetrator to commit the crime.' ") (quoting Perkins, *Criminal Law* 645 (2d ed. 1969)) (emphasis added).

More importantly, the meaning of these terms is constrained by the context in which they are actually used in the injunction. *Cf. Grayned v. City of Rockford,* 408 U.S. 104, 108–12, 92 S.Ct. 2294, 2298–2301, 33 L.Ed.2d 222 (1972) (upholding ordinance, as understood in context and against background of judicial construction, against vagueness challenge). The preliminary injunction prohibited appellants from "inducing" or "encouraging" others to trespass on or blockade six specifically identified clinics in the District of Columbia. 726 F.Supp. at 305. The permanent injunction prohibits appellants from trespassing on or blockading nine specifically identified clinics, and further prohibits "inducing" or "encouraging" others "to trespass on [or] blockade ... any facility at which abortions, family planning, or gynecological services are performed in the District of Columbia." 747 F.Supp. at 771 (revised permanent injunction). As the district court itself stated after contempt citations had been issued, "it is clear that 'inducing' and 'encouraging' the violations are defined in context of the Injunction and are understood by all the parties to mean direct incitement of these blockades." Memorandum Opinion, July 29, 1993, J.A. 174.

The district court said it intended the "inducing" and "encouraging" language in the injunction to prohibit "inciting" unlawful acts, and no more. Such a construction of the "inducing" and "encouraging" language as narrowly aimed at prohibiting appellants from "inciting" unlawful acts is certainly plausible, given the context of ongoing unlawful blockades. On this reading, the injunction would reach neither abstract advocacy of the kind implicated in *Brandenburg,* nor the organizing of lawful demonstrations which may ultimately include unauthorized unlawful acts, as in *Claiborne Hardware.* It is well settled that incitement to specific unlawful acts may be prohibited without running afoul of First Amendment guarantees. *See Brandenburg,* 395 U.S. at 447, 89 S.Ct. at 1829.

■ By relying upon the terms "inducing" and "encouraging" rather than "inciting" to mean inciting, the injunction introduces an easily avoidable measure of unclarity as to what speech and conduct is prohibited. Before the district court's clarification in its July, 1993 opinion, the words of the injunction might have been more broadly interpreted by appellants and others to whom they were applied. Had the district court instead chosen its words more precisely, and used the term "inciting" to prohibit inciting, the injunction would have accomplished all it sets out to accomplish, while making it plain to all that no protected speech is impermissibly burdened. Reviewing the injunction under the demanding standard set out in *Madsen,* whether the challenged provisions "burden no more speech than necessary to achieve a significant government interest," *Madsen,* —— U.S. at ——, 114 S.Ct. at 2525, we conclude that the language of the injunction was vague enough to create an impermissible potential for overinclusiveness.

■ We do not find it necessary to vacate the district court's contempt orders on this ground, however. Where an overinclusiveness challenge is brought by a party who engages in *both* protected and unprotected speech, the court may save a statute if there is a severable provision that prohibits unprotected speech. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503–04, 105 S.Ct. 2794, 2801–02, 86 L.Ed.2d 394 (1985). We see no reason why the same should not be true of injunctions, and, in this case, a suitable narrowing construction is readily at hand. The district court can simply strike the words "inducing" and "encouraging" and substitute the word "inciting," and the injunction will no longer be overinclusive.

Amending the injunction in this manner also cures any due process problem. *See Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99

(due process violated when "the person of ordinary intelligence [lacks] a reasonable opportunity to know what was prohibited," the law thus "trap[ping] the innocent by not providing fair warning"). Since we are vacating most of the district court's second contempt order on other grounds, *infra* Part II.D., any subsequent contempt proceedings will be based either upon past conduct alleged to constitute "inciting"—which is clearly *within* the terms of which appellants had notice, "inducing" or "encouraging"—or upon future conduct alleged to violate a modified injunction that will explicitly prohibit "inciting" unlawful conduct. All of the surviving contempt sanctions are based upon violations of other court orders or of provisions of the injunction other than those challenged on overinclusiveness or vagueness grounds.[2]

Therefore, we remand the injunction order to the district court, with instructions to modify the language of the injunction to conform precisely to the district court's expressed intention that the injunction prohibit appellants from "inciting" unlawful acts, and no more.

### 2. Compelled Speech

Relying on a line of cases that includes *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); and *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), Operation Rescue contends that the district court's order that noncompensatory civil contempt fines be paid to appellees' abortion clinics runs afoul of the First Amendment because it impermissibly coerces appellants to support causes and practices they find ideologically objectionable and morally repugnant. Appellants' Brief at 26. Because we are remanding the district court's contempt orders for further proceedings consistent with *International Union, United Mine Workers v. Bagwell, see* Part II.D. *infra*, it is unnecessary that we reach this issue at this time. We cannot speculate on the nature or extent of contempt sanctions, if any, that may ultimately result from whatever proceedings follow upon remand, and we may not offer an advisory opinion as to whether any such sanctions, civil or criminal, could be in the form of fines payable to an opposing party.

### D. Contempt Sanctions

Operation Rescue contends that, except for compensatory fines totalling $7,023 and per diem sanctions against Keith Tucci in the amount of $41,600, the contempt fines ordered below were "punitive" sanctions for violation of a "prohibitory" order, rather than "coercive" or "compensatory" in nature. Therefore, Operation Rescue reasons, the fines should be treated as criminal rather than civil contempt sanctions, entitling the alleged contemnors to the additional protections of criminal process. Appellants' Brief at 33–34; Appellants' Reply Brief at 12–14.

The district court characterized the contempt sanctions as partly "compensatory" and partly "coercive," insofar as they were drawn prospectively to compel Operation Rescue's compliance with the injunction. J.A. 110, 115. Like other civil contempt sanctions, these fines could have been avoided by Operation Rescue's simple compliance with the injunction and consequently, appellees contend, the sanctions are civil in nature. Appellees' Brief at 30–34.

---

**2.** As described more fully *infra* at Part II.D., the surviving contempt sanctions are as follows: against Operation Rescue, Clifford Gannett, Joseph Foreman, Susan Odom, and Michael McMonagle, jointly and severally, $6,013 to compensate clinics for damages based upon blockades on November 8, 1989; against Operation Rescue and Operation Rescue National, $1,010 to compensate the Hillcrest Women's Surgi–Center for damages resulting from an unlawful trespass on January 22 and April 4, 1992; and against Keith Tucci, $41,600 in per diem fines for failure to appear in court. The district court found that Gannett, Foreman, Odom, and McMonagle violated the preliminary injunction by physically blocking access to clinics. 747 F.Supp. at 776. The unlawful blockades and trespasses were "organized and sponsored," "directed," "carried out under the names of," and funded by, Operation Rescue and Operation Rescue National, which violated the injunction "both through [their] own acts and the acts of [their] officers and leaders." 747 F.Supp. at 775–76; J.A. 153. Tucci was fined for violations of an order to appear in court.

Courts have long relied upon slippery distinctions between "mandatory" and "prohibitory" orders, "punitive" and "coercive" sanctions, and "prospective" and "retrospective" application of sanctions to classify contempt proceedings as either civil or criminal. *See, e.g., Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 442–43, 31 S.Ct. 492, 498–99, 55 L.Ed. 797 (1911) (civil contempt where "the defendant has refused to do an affirmative act required by ... an order ... mandatory in its character," and "intended to coerce the defendant to do the thing required"); *Hicks v. Feiock,* 485 U.S. 624, 632, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988) (contempt fine is "remedial when it is paid to the complainant, and punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order").

In *International Union, United Mine Workers of America v. Bagwell,* —— U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), the Supreme Court rejected these categorizations as definitive bases for classifying contempts as civil or criminal. *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2561. The *Bagwell* Court did not abandon the basic distinction between civil and criminal contempts, but recognized that the boundary is often "elusive," —— U.S. at ——, 114 S.Ct. at 2559, especially when courts impose prospective fines for recurring out-of-court violations of complex injunctions, *id.* at ——, 114 S.Ct. at 2561. While the *Bagwell* Court declined to articulate a bright-line rule for determining when such a contempt sanction should be considered criminal or civil, it did enunciate some principles to guide our reasoning. Under those principles, at least some of the contempt fines in this case appear to fall on the criminal rather than the civil side.

In *Bagwell,* a Virginia state court levied contempt sanctions totalling $52,000,000 against the United Mine Workers union for repeated violations of an injunction prohibiting the union and its members from engaging in illegal picketing practices, including obstruction of ingress and egress to company facilities. The fines were imposed according to a schedule announced prospectively, and the court explicitly characterized them as " 'civil and coercive,' " saying that payment " 'would only be required if it were shown the defendants disobeyed the Court's orders.' " *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2555 (quoting Virginia court's order). Nonetheless, the Supreme Court held that these sanctions were criminal, entitling the alleged contemnors to additional procedural protections.

The *Bagwell* Court discussed but did not call into question the traditional classification of *some* categories of contempt sanctions—compensatory fines, coercive imprisonment, and per diem fines to coerce compliance with affirmative court orders—as civil in nature. *Id.* at ——, 114 S.Ct. at 2558. But in the case of other penalties, such as prospective fixed fines, the Court explained that classification is more difficult, and should ultimately turn on the fundamental question of "what procedural protections are due before any particular contempt penalty may be imposed," *id.* at ——, 114 S.Ct. at 2559, in light of "the competing concerns" of protecting the judicial process and preventing arbitrary exercises of the contempt power, *id.* Thus, fewer procedural protections are required for immediately-sanctioned, petty, direct contempts in the presence of the court, where proof problems are not great and "the necessity justification for the contempt authority is at its pinnacle" because "contumacious conduct threatens a court's immediate ability to conduct its proceedings...." *Id.* at ——, 114 S.Ct. at 2559. But as sanctions become more serious and factfinding becomes more complex, due process demands greater procedural safeguards. *Id.* at ——, 114 S.Ct. at 2560. Certain out-of-court contempts, such as failure to comply with document discovery, "impede the court's ability to adjudicate the proceedings before it and thus touch upon the core justification for the contempt power," and therefore may be treated as civil contempts. *Id.* Other contempts, such as failure to perform "discrete, readily ascertainable acts" like turning over a key or paying a judgment, may be adjudicated through civil proceedings since factfinding remains relatively simple and the danger of judicial abuse is slight. *Id.* But "[c]on-

tempts involving out-of-court disobedience to *complex* injunctions often require elaborate and reliable factfinding," *id.* (emphasis added), and "[u]nder these circumstances, criminal procedural protections such as the rights to counsel and proof beyond a reasonable doubt are both necessary and appropriate to protect the due process rights of parties and prevent the arbitrary exercise of judicial power," *id.* at ——, 114 S.Ct. at 2561.

Applying these factors to the case at hand, the *Bagwell* Court ruled that the lower court's characterization of the fines as "civil" and "coercive" rather than "criminal" and "punitive" was not controlling. —— U.S. at ——, 114 S.Ct. at 2563. Nor was it decisive that the fines were announced prospectively. *Id.* at ——, 114 S.Ct. at 2561. Under the facts of *Bagwell,* the contempt fines were appropriately regarded as criminal, because they involved out-of-court violations of a complex injunction which did not implicate the "core justification" of protecting the court's ability to conduct the proceedings immediately before it, but did involve difficult proof problems necessitating impartial factfinding. In so holding, *Bagwell* "imposes ... procedural burdens on courts' ability to sanction widespread, indirect contempts of complex injunctions through noncompensatory fines," —— U.S. at ——, 114 S.Ct. at 2563, a characterization that also appears to fit at least some of the fines in the present case.

The fines in *Bagwell* were extremely harsh, totalling $52,000,000; in contrast, the sanctions here are much smaller, totalling $193,623. Nonetheless, the fines here are large enough to invite our scrutiny under the principles enunciated in *Bagwell.* Only a small portion ($7,023) of the fines here were explicitly compensatory in nature. The district court's first contempt order, dated July 31, 1990, imposed only compensatory contempt fines, in the amount of $1,680 for damages to the Hillcrest Clinic, $533 for damages to the Capitol Women's Center, and $3,800 for damages to the Washington Surgi-Clinic. J.A. 113. These fines are clearly compensatory and civil, *cf. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2558, and are not at issue in this appeal, *see* Appellants' Brief at 33 (challenging "punitive" fines but recogniz-

ing that explicitly compensatory fines are civil in nature).

The district court's second contempt order, dated March 15, 1993, and amended on April 28, 1993, includes a $1,010 compensatory fine for damages to the Hillcrest Women's Surgi–Center, and per diem fines totalling $41,600 ($100 per day of violation) against appellant Keith Tucci for failure to appear in court in violation of the court's affirmative order to do so. These, too, are clearly civil in nature under traditional classifications that remain unchallenged by the *Bagwell* decision. *Cf. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2558. However, the bulk of the fines in the second contempt order were imposed for "knowing and deliberate" violations of the injunction according to a schedule prospectively established in the district court's July 31, 1990 order: against Keith Tucci, $15,000; against Operation Rescue National and Operation Rescue jointly, $100,000; against Clifford Gannet, $15,000; against Patrick Mahoney, $10,000; and against Joseph Foreman, $5,000. J.A. 158–64. Although the district court characterized these as "civil" and of a "dual compensatory and coercive nature," J.A. 155, they are by the district court's own acknowledgement at least partly noncompensatory, and the district court nowhere made a determination as to what injury was being compensated, or why fines in these amounts were appropriate compensation. *Cf. Bagwell,* —— U.S. at ——, 114 S.Ct. at 2561 ("At no point did the trial court attempt to calibrate the fines to damages caused by ... contumacious activities...."). Neither the district court's characterization of these fines as "civil," nor the fact that the penalties were announced in advance, is controlling. *Cf. Bagwell,* —— U.S. at ——, ——, 114 S.Ct. at 2561, 2563. Nor do these contempts go to the "core justification" of protecting "the court's ability to adjudicate the proceedings [immediately] before it," *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2560, nor do they consist of "discrete, readily ascertainable acts" like failure to turn over a key or pay a judgment, which "properly may be adjudicated through civil proceedings since the need for extensive, impartial factfinding is less pressing," *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2560. Instead,

they fall into that broad category of "[c]ontempts involving out-of-court disobedience to complex injunctions [which] . . . require elaborate and reliable factfinding" and where "the risk of erroneous deprivation from the lack of a neutral factfinder may be substantial." *Bagwell,* —— U.S. at —— –——, 114 S.Ct. at 2560–61. In these circumstances, the protections of criminal procedure are necessary under the principles enunciated in *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2561.

Concededly, the injunction here may be somewhat less "complex" than that in *Bagwell,* which the Supreme Court characterized as prescribing "an entire code of conduct" for UMWA officials. *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2562. But on a scale of complexity ranging from simple affirmative acts like turning over a key or paying a judgment where civil contempt proceedings may be appropriate, —— U.S. at ——, 114 S.Ct. at 2560, to highly complex *Bagwell*-type prohibitory injunctions barring broad classes of illegal acts where criminal process is required, the out-of-court acts prohibited by the court's order here fall closer to the *Bagwell* end of the spectrum. In particular, the injunction here prohibits not only "trespassing on, blockading, impeding or obstructing access to or egress from" the clinics, but also "[inciting], directing, aiding or abetting others in any manner, or by any means, to trespass on, blockade, impede or obstruct ingress or egress from such premises." 747 F.Supp. at 771. Determining whether alleged contemnors have incited, directed, aided or abetted others to commit acts prohibited by this injunction demands elaborate factfinding of a kind that, according to *Bagwell,* necessitates the safeguards of criminal procedure. Indeed, in the proceedings below, the district court required ten pages of opinion just to summarize the findings of fact upon which these contempt citations were based. *See* J.A. 143–52. Finally, it is noteworthy that while continuing to characterize these fines as civil contempt sanctions, the district court itself at times has recognized their punitive character. *See* J.A. 178 ("the compulsion in this case is imposed *as a punishment* for unlawful activity") (emphasis added).

We cannot conclude from the record before us that these fines in their entirety are punitive and require criminal procedures. The district court expressed the view that some unspecified portion of these fines are "compensatory," and it may well be that in further *civil* proceedings on remand compensable injuries to appellants may be proven, justifying reinstatement of some part of these fines as compensatory civil fines. We note, for example, that the district court's first contempt order compensated the clinics for payroll costs they incurred on days their staff were unable to see patients as a result of the first round of illegal blockades in November, 1989. 747 F.Supp. at 777. It is certainly possible that the second and third rounds of blockades caused similar compensable harms to the clinics, but the second contempt order reached no specific findings of compensable payroll costs, presumably because the flat-rate fines under the second order—payable to the clinics—"included" (and were more than adequate to cover) these compensable losses. We express no opinion as to whether the clinics may have suffered other kinds of compensable injuries. However, it is incumbent upon the district court to make an express determination as to the existence, nature, and extent of any such compensable damages, and to tailor compensatory civil fines accordingly; under the Supreme Court's guidance in *Bagwell,* such determinations may be made in further civil proceedings. *See Bagwell,* —— U.S. at ——, 114 S.Ct. at 2563. Any fines for out-of-court violations of this complex injunction not expressly determined to be compensatory or otherwise falling into a category appropriate for treatment as a civil contempt under *Bagwell,* however, must be regarded as criminal, entitling the alleged contemnors to criminal procedural protections. And a mixed civil and criminal contempt proceeding must afford the alleged contemnor the protection of criminal procedure. *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2561, citing *Hicks v. Feiock,* 485 U.S. 624, 639 n. 10, 108 S.Ct. 1423, 1433 n. 10, 99 L.Ed.2d 721 (1988).

Finally, we note that the district court did not have the benefit of the Supreme Court's teaching in *International Union, United Mine Workers of America v. Bagwell* at the

time it ruled on the contempt sanctions at issue in this appeal. It is thus not surprising that the district court did not, and could not, anticipate the revised standards under which we review its rulings. Nonetheless, it is not too late to correct course; but the precise correction required in this case is a matter appropriately left to the district court in the first instance.

For these reasons, the district court's second contempt order, with the exception of those portions providing for per diem fines totalling $41,600 against Keith Tucci and a fine of $1,010 against Operation Rescue and Operation Rescue National to compensate appellee Hillcrest Women's Surgi–Center for damages, is hereby vacated and remanded to the district court for reconsideration and such additional proceedings as may be appropriate in light of the principles enunciated in *International Union, United Mine Workers v. Bagwell.*

### E. Compensatory Damages to Washington Surgi–Clinic

Finally, we address Operation Rescue's contention that the district court improperly awarded compensatory damages for bushes trampled during a blockade at the Washington Surgi–Clinic in November, 1989, because appellees did not prove damages by "clear and convincing evidence." Appellants' Brief at 34. NOW responds that because appellees' evidence of damages was uncontroverted, they met their evidentiary burden under whatever standard is appropriate. Appellees' Brief at 37–38.

■ A party moving for civil contempt must establish by clear and convincing evidence that the defendant has violated a court order. *Washington–Baltimore Newspaper Guild v. Washington Post,* 626 F.2d 1029, 1031 (D.C.Cir.1980). Some courts have held that once a violation has been established, damages need be proven only by a preponderance of the evidence. *See, e.g., Graves v. Kemsco Group, Inc.,* 864 F.2d 754 (Fed.Cir. 1988) (applying 7th Circuit law). Other courts have held that damages must also be proven by clear and convincing evidence. *See, e.g., Nelson Tool and Machine Co., Inc. v. Wonderland Originals, Ltd.,* 491 F.Supp.

268, 269 (E.D.Pa.1980). The question is unsettled in this circuit.

■ Here, however, it is of no import whether the standard is "clear and convincing evidence" or mere "preponderance," and therefore we need not decide which standard applies. Appellees introduced into evidence a written estimate of the replacement cost prepared by the same landscaper who had initially installed the bushes. Dr. Fogel, head of the Washington Surgi–Clinic, testified this estimate was "reasonable." J.A. 195. Appellants declined to cross-examine Dr. Fogel on this point, or to introduce their own evidence in rebuttal. J.A. at 191–96. Based on this evidence, the district court found damages of $3,800. Operation Rescue objects that the district court improperly shifted the burden to appellants to show the estimate was not "fair and reasonable," citing the district court's own summary of the evidence: "Plaintiffs introduced into evidence an estimate of $3,800 for repair of the bushes. Defendants did not introduce any evidence that this estimate was not fair and reasonable." *See* 747 F.Supp. at 777. "Reasonableness" is, under these circumstances, an element of proof of damages. *See* RESTATEMENT (SECOND) OF TORTS § 929 (when trespass harms land, landowner may recover "cost of restoration that has been or may be reasonably incurred"); *id.* at § 911, cmt. b (damages are measured by market values, reflected in comparable sales or "amounts that have been bid and asked for substantially identical things"). We read the district court's statement not to shift the evidentiary burden as to the "reasonableness" of the restoration cost, but merely to indicate that appellants did not rebut appellees' evidence on this point.

The trier of fact need not accept even uncontroverted evidence if it doubts the credibility of that evidence. *Smith v. C.I.R.,* 800 F.2d 930, 935 (9th Cir.1986). Here, however, the district court placed credence in the uncontroverted evidence offered by appellees. Even on a "clear and convincing evidence" standard, which requires a showing of "more than 'mere preponderance of the evidence,' but still somewhat less than ... 'beyond a reasonable doubt,'" *Collins Sec. Corp. v.*

*SEC,* 562 F.2d 820, 824 (D.C.Cir.1977), we cannot conclude that the district court's finding on the question of damages was clearly erroneous.

### III. CONCLUSION

For the foregoing reasons, the judgments of the district court are affirmed in part, vacated in part, and remanded in part for further proceedings consistent with this opinion.

*It is so ordered.*